# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN ISLEY, | : | |
| Plaintiff, | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 16-1462** |
| | : | |
| AKER PHILALDELPHIA SHIPYARD, INC., | : | |
| Defendant. | : | |

**MCHUGH, J.**                                                      **August 17, 2017**

## MEMORANDUM

In this employment case, a worker slated for termination because of poor attendance asked that his employer retroactively reclassify two of his unexcused absences as protected leave under the Family and Medical Leave Act (FMLA), or the Americans with Disabilities Act (ADA), as supplemented by state law.  The employer declined and proceeded to fire him.  Discovery is now complete, and because there is no evidence of discriminatory intent, and the plaintiff was not eligible for FMLA leave as a matter of law, summary judgment will be granted in favor of the employer.

## I.      BACKGROUND

Plaintiff Kevin Isley was employed by Defendant Aker Philadelphia Shipyard (the Shipyard) from February 2013 until February 2015.  During this time, he earned generally favorable performance reviews and was promoted from "laborer" to "ship-fitter," but also accumulated 12 "no-pay" absences—two more than were permitted under the Collective Bargaining Agreement (CBA) that governed his employment.  On that basis, the Shipyard fired him.

1

Isley's last two absences, which resulted in his termination and are the focus of this suit, occurred on February 19 and 23, 2015. On the afternoon of the 19th, Isley began experiencing chest pains and shortness of breath. These symptoms intensified over the course of the day and around 9:00 p.m., an hour before his shift was scheduled to begin, Isley had a friend drive him to a local emergency room, where he remained for approximately three and half hours, until 12:30 a.m. the following day. During this time, doctors ran a battery of tests, ruled out the possibility of a heart attack, and diagnosed Isley with costochondritis, an inflammation of the cartilage in the rib cage which normally subsides on its own. Accordingly, Isley was directed to rest for a few days, take Motrin with meals, and follow up with a physician if necessary, but was not otherwise told to take any specific follow-up action.

The episode on February 19 was Isley's second bought of costochondritis, the previous flare-up having occurred in April 2014. Then too, Isley visited the E.R. but he did not miss any of his scheduled shifts and never informed anyone at the Shipyard that he had a medical condition. By contrast, on February 20, 2015, Isley claims that he called his union steward, Sean Harvey, and told him that he had been to the hospital "for my heart." Resp. Ex. R at 131:16–17. Similarly, Isley claims that on February 23, his next scheduled day of work, he called his supervisor, Shawn James and told him that he would again be absent due to "heart issues." *Id.* at 164:19–20.[1] Isley also sent to Harvey and James a digital image of a note that he received from his E.R. doctor on February 20. That note explained that Isley had been "medically cleared for discharge" from the E.R. and could "return to work/school on: 2/23/15."[2] Because Harvey and

[1] Both James and Harvey deny that Isley ever told them that he had a heart condition. Resp. Ex. T at 29:6–11; Ex. W at 16:24; 17:1–2.

[2] Although his note cleared him for work on February 23, Isley claims that he was still suffering from chest pain on that day and required additional time for recuperation.

James were not responsible for tracking Isley's attendance or making requests for medical leave on his behalf, neither man relayed Isley's communications to the Shipyard's Human Resources (H.R.) department.[3]

Isley returned to work on February 24. On February 26, Sandy Galassco, a member of the Shipyard's H.R. department, prepared a one-page "Notice of Impending Termination," which stated that Isley had exceeded the allowable number of no-pay absences, listed the dates on which he had missed work in the previous 24 months, and directed him to contact H.R. or his supervisor if he believed the information on the form was incorrect.[4] Galassco gave the Notice to James and Harvey, who presented it to Isley. All three men signed the document, which was then submitted to Marion Meixsell, H.R. generalist. On the basis of the signed Notice, Meixsell decided to fire Isley. Resp. Ex. S at 33:9–24. Consequently, and still on February 26, Meixsell electronically signed and dated a Union Employee Data Change Form in preparation for a meeting the following morning with Isley and Harvey, the shop steward. *Id.* at 54:18–24; Resp. Ex. D.

At the February 27 meeting, Isley claims that he told Meixsell that he had gone to the E.R. because of a heart condition. Meixsell disputes this account, and claims that Isley told her that he went to the hospital because he had the flu. Meixsell and Isley agree, however, that a central topic of discussion during the meeting was Isley's 32-hour balance of "personal time"— paid leave that he could have applied to excuse his absences on the 19th and 23rd by calling into an H.R. hotline *before* missing work on those dates. As Isley recalled, "[Harvey] let Marion

---

[3] Both Harvey and James testified that they did not discuss Isley's absences on the 19th and 23rd with anyone else at the Shipyard. Resp. Ex. T at 12: 6–17; Resp. Ex. W at 16–17. Isley does not allege otherwise and nothing in the record suggests that anyone in Human Resources was aware of Isley's E.R. visit, or the reason for it, until February 27.

[4] Isley never disputed the information contained on the Notice of Termination form. Resp. Ex. R at 107: 2–9.

[Meixsell] know, he [(Isley)] has enough [personal time], could you just take the days off that, because I [(Harvey)] need him, he's a good worker." Def. Ex. R at 146:14–17. Meixsell apparently found that Isley's balance of personal time weighed against granting him a second chance, concluding, in effect, that Isley's termination was a problem of his own making since "he could have used 16 hours [of personal time] to save his job and chose not to use the time." Resp. Ex. M. She therefore informed him of his discharge, effective immediately.

Isley's union appealed his termination by filing a grievance and requesting a "third step" hearing. That hearing was held on March 12, before Michael Giantomaso, the Shipyard's V.P. of H.R. As Giantomaso explained, at third step hearings, the Shipyard and the union each present their side of the story "and then I make my decision within five business days in writing. If the union doesn't like my decision then they can take it to . . . binding arbitration." Resp. Ex. V at 53:3–8. Prior to the third step hearing, Giantomaso did not know why Isley had been terminated, let alone the reason for Isley's absences on February 19 or 23. *Id.* at 52:16–22; Resp. Ex. S at 49:2–7.

Isley attended the third step hearing and was also represented by three union members: Dave Gaillard, James Hall, and Fred Chamberlain. Meixsell, representing the Shipyard, reiterated her view that Isley's firing was warranted because he exceeded his ten-absence limit and could have, but did not, cover his absences using his accumulated personal time. According to Giantomaso, Isley responded by claiming he didn't "know how to call out personal time.' And I asked him again, 'You don't? You've never called out personal time?' He said 'No, I never did, I don't know how.'" *Id.* at 45:3–7. Giantomaso claims that he and Chamberlain then reviewed Isley's time records and found that he had in fact used personal time on several other occasions, leading Giantomaso to conclude that Isley "provided false information and lied to

me"—grounds for termination under the CBA.[5]  *Id.* at 45:11–12.  Isley disputes this version of events.  He claims that "I didn't say I didn't know how to use personal time.  I said that I didn't know that I had to use personal time to go to the hospital."  Resp. Ex. R at 136:17–20.  Isley also maintains that he explained that his absences on the 19th and 23rd were due to a heart condition and demanded to know why his absences were not excused as FMLA-qualifying leave.  Resp. Ex. R at 139:2–7.

Giantomaso issued his decision on March 20 in a letter that he sent to various Shipyard officials and to the attendees at the third step hearing, including Isley's union representatives.  In that letter, Giantomaso explained that during the hearing, "Mr. Isley stated [he didn't] know how to use personal time," which led Giantomaso to "personally check[]" the Shipyard's timesheet records where he "found that Mr. Isley used personal time on 6 different occasions."  Resp. Ex. O.  According to Giantomaso, "[t]his prove[d] . . . that Mr. Isley knew how to use the personal time and he decided not to."  *Id.*  "As a result" Giantomaso concluded, "I am sustaining the discharge and denying the grievance."  *Id.*  The union elected not to challenge Giantomaso's decision by submitting Isley's grievance to arbitration, and Isley's termination became final.

Isley then initiated the current suit, arguing that the Shipyard violated the ADA, the Pennsylvania Human Resources Act (PHRA), and FMLA when it refused to excuse his absences on February 19 and 23.  The Shipyard now moves for summary judgment.  For the reasons below, that motion will be granted.

## II.  STANDARD

The well-established standard for summary judgment is governed by Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

---

[5] Isley does not dispute that lying at a third step hearing is a fireable offense under the CBA.

## III.    DISCUSSION

### A.  Isley's ADA Claims

The ADA forbids covered employers from discriminating against disabled individuals. Prohibited discrimination includes retaliation against an employee who, in good faith, requests an accommodation, whether that employee is disabled or not.  Isley brings largely overlapping claims under both discrimination and retaliation theories.[6]

#### 1.  Discrimination

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Id.*  "In other words, an employer can unlawfully 'discriminate' within the meaning of the ADA in two different ways . . . :  (1) if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability or the employer's belief that the individual had a disability (i.e. disparate treatment); or (2) if the employer fails to make reasonable accommodations for that individual."  *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 361 (E.D. Pa. 2013).  Isley brings "disparate treatment" and "failure to accommodate" claims, which I discuss in turn below.

Because "the ADA . . . and Title VII . . . serve the same purpose—to prohibit discrimination in employment against members of certain classes[—]. . . the methods and manner of proof under one statute . . . inform the standards under the others as well."  *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).  Thus, an ADA plaintiff can prove discrimination directly as, in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985), or

---

[6] Isley also brings closely related claims under the PHRA.  "The PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts."  *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002).  My resolution of Isley's ADA claim therefore also disposes of his PHRA claim.

circumstantially, using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Williams v. Phil. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 & n.3 (3d Cir. 2004) (applying *McDonnell Douglas*).

Isley argues that this is a direct evidence case because the Shipyard "counted . . . ADA protected absences" on February 19 and 23 against him, thereby demonstrating its discriminatory bias with clarity sufficient to render unnecessary *McDonnell Douglas*'s burden-shifting approach. Resp. at 3. This argument assumes too much. As discussed at length below, Isley has not established that he notified the Shipyard of his disability, or that he requested an accommodation. Because Isley has not shown that the Shipyard knew he was disabled, its decision to fire him shortly after he missed work for health-related reasons is, at best, circumstantial evidence of discriminatory bias. This case is therefore properly analyzed under *McDonnel Douglas*'s burden-shifting framework.

### a. Disparate Treatment

"[I]n order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). If Isley succeeds, then the burden shifts to the Shipyard to articulate a legitimate nondiscriminatory reason for Isley's termination. If the Shipyard carries its burden, Isley must prove that the articulated reason was a mere pretext for discrimination.

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities . . . ; a record of such an impairment; or being regarded as

having such an impairment." 42 U.S.C. § 12102. Major life activities, "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. Unhappy with the Supreme Court's narrow interpretation of the ADA's protections, Congress amended the statute in 2009, directing courts to construe "disability" "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." *Id.* Consistent with Congress's instruction, the statute's implementing regulations provide:

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2.

Under this relaxed standard, a reasonable jury could find that Isley's costochondritis qualified as a disability under the ADA.[7] According to Isley, when his condition flares up, he experiences symptoms similar to those of a heart attack: severe chest pain, shortness of breath, and light-headedness. Isley plausibly asserts that these symptoms leave him in acute discomfort, thereby substantially limiting major life activities including the ability to sleep and breathe.[8]

---

[7] The Pennsylvania Legislature has not adopted Congress's expanded definition of disability and courts therefore evaluate PHRA claims under the ADA's pre-2008 definitions of disability. *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014). Neither party has briefed this matter, however, and it is therefore unclear if Isley's condition would qualify as a disability under the PHRA. But because I find that Isley's ADA claim fails even if he is deemed "disabled," I need not determine whether his costochondritis constitutes a disability within the meaning of the PHRA.

[8] The Shipyard twice cites *Sutton v. United States*, 527 U.S. 471, 491 (1999), without qualification, for the proposition that Isley's ADA claims fail because "the record . . . is devoid of any evidence that [he] could not perform a broad class of jobs." MSJ at 19 n.4; Reply at 11. This is misleading. The relevant issue in *Sutton* was whether the claimants were disabled because they were substantially limited in their ability to work. The Court looked for guidance to then-current regulations from the EEOC, which defined a substantial limitation on the ability to work as one that "significantly restricted . . . the ability to perform either a class of jobs or a broad range of jobs in

8

Finally, because "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," 42 U.S.C. § 12102, the sporadic nature of Isley's costochondritis does not foreclose a finding of disability. I therefore conclude that Isley has established the first element of his prima facie case.

The Shipyard concedes for the purposes of this motion that Isley was qualified for his position—the second element of his prima facie case.

Isley falters, however, at the third element, which requires a causal connection between his termination and his real or perceived disability. Isley maintains that the record supports an inference of discrimination because Meixsell fired him shortly after learning that he sought medical treatment for a heart condition, but this theory of liability based on temporal proximity does not withstand scrutiny.

Meixsell testified that she decided to fire Isley on February 26 when she received the Notification of Approaching Termination that was signed by Isley, James, and Harvey, and which indicated that Isley had accumulated twelve no-pay absences over a twenty four–month period—grounds for discharge under the CBA. Resp. Ex. S at 33:13–24; Resp. Ex. N. Consistent with her testimony, also on February 26, Meixsell electronically signed and dated Isley's discharge paperwork in preparation for a meeting with Isley and Harvey, scheduled for the following morning, February 27. Resp. Ex. D; Resp. Ex. S at 54:14–24; 55:1–5. Although Isley claims that, by February 23, he had told Harvey and James that he had visited the

---

various classes." 527 U.S. at 493 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). However, *Sutton* was decided before Congress amended the ADA in 2008 to broaden the scope of the statute's protections. Under current regulations, the EEOC has clarified that the need to conduct "class-of-jobs" analysis has been largely eliminated:

> In most instances, an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than working; impairments that substantially limit a person's ability to work usually substantially limit one or more other major life activities.

29 C.F.R. Pt. 1630, App. § 1630.2. Because Isley's costochondritis appears to have interfered with his ability to sleep and breath, his failure to show that he was unable to perform a broad class of jobs is not fatal to his ADA claim.

emergency room because of a heart condition, Isley does not claim, and nothing in the record indicates, that either man relayed this information to Meixsell or anyone else in H.R. Resp. Ex. S at 88: 5–20. And while Isley maintains that he met with Meixsell and told her about his E.R. visit, by his own recollection, that discussion took place on the very day he was let go: February 27. Def. Ex. R at 165: 18–22. Thus, even assuming that Isley explained the reason for his last two no-pay absences to Meixsell before Meixsell told him, in so many words, "you're fired," it's clear that Isley's purported disclosure of his heart issues came *after* Meixsell initiated the discharge process upon receiving a written notice of Isley's fireable offense. This undisputed evidence of chronology defeats Isley's contention that Meixsell decided to fire him because she learned of his condition.

Isley next argues that discrimination can be inferred from Meixsell's decision not to excuse his February 19 and 23 absences after learning of the reason for those absences.[9] In support of this theory, he contends that the Shipyard regularly excused the absences of other employees who missed work for non-medical reasons, but the only evidence Isley musters is Meixsell's testimony that she and H.R. V.P. Giantomaso excused absences of two other workers, one for a funeral, and one because of car trouble. Def. SOF (Dkt. 24–1) ¶¶ 19–21; Resp. Ex. S at 29–32. Furthermore, it is unclear whether these unidentified workers were themselves disabled, making it impossible to say whether the Shipyard's decision to excuse their absences supports an inference of disability discrimination in Isley's case.[10] Nor is it clear if they, like Isley, had exceeded the allowable number of no-pay absences and were therefore subject to termination.

---

[9] In addition to this disparate treatment claim, Isley also brings a "failure to accommodate" claim based on Meixsell's refusal to excuse his absences. That claim is discussed below.

[10] Further undercutting Isley's case that he was singled out for harsh treatment because he had a serious medical condition, it appears that the Shipyard excused non-FMLA absences in the case of at least one FMLA-qualified employee. Def. SOF ¶ 90.

What is clear is that Isley was not the only employee that the Shipyard fired for violating its attendance policy—Harvey alone represented in his capacity as union steward between 10 and 50 such employees during third step grievance hearings. Ex. W at 13: 13–20.[11] Against this backdrop, Meixsell's failure to excuse Isley's absences does not, by itself, create a plausible inference that he was terminated as a result of his disability. Accordingly, Isley's disparate treatment claim fails to the extent it is based on Meixsell's actions.

Isley also asserts that Giantomaso's decision to uphold his termination following his third step hearing provides an independent basis for his disparate treatment claim. Unlike Meixsell, who initiated Isley's termination before she learned of his health problems, Giantomaso upheld Isley's firing shortly after learning for the first time that he visited the E.R. for a heart condition. Assuming for the sake of argument that this sequence of events supports an inference of disability discrimination, under *McDonnel Douglas*, the burden shifts to the Shipyard to assert a legitimate basis for upholding Isley's termination. The shipyard carries this burden, arguing that Giantomaso upheld Isley's termination because Isley falsely claimed during his third step hearing that he did not know how to use personal time to cover his absences. Because the CBA allows the Shipyard to summarily fire employees who lie at a third step hearing, the Shipyard contends that Giantomaso's decision to uphold Isley's termination was warranted, irrespective of Isley's medical condition. In response, Isley maintains that he never told Giantomaso that he did not know how to use personal time—a dispute of fact he contends is sufficient to defeat summary judgment. I disagree.

---

[11] Harvey was not the only shop steward responsible for representing union members at grievance hearings. Indeed, Isley was represented at his third step hearing by another steward, Fred Chamberlain. Harvey's tally therefore should not be considered a complete estimate of the number of employees that the Shipyard fired for violating its attendance policy.

In employment discrimination cases like this, the Third Circuit recognizes the so-called "honest belief rule." Under this doctrine, "the critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Capps*, 847 F.3d at 153 (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)). Courts should invoke the "honest belief" rule sparingly and with great caution, because it is too easily subject to manipulation whereby pretextual action can be disguised as legitimate. But Giantomaso's actions immediately following the third step hearing convince me that it applies here. Specifically, in his March 20 letter, Giantomaso explained that he had decided to uphold Isley's termination because Isley had falsely claimed during the third step hearing that he did not know how to use personal time to cover his absences. Significantly, all three union representatives who received that letter had been present at the hearing on Isley's behalf and thus were in a position to dispute Giantomaso's version of events. As Giantomaso noted, if these men disagreed with his stated reason for upholding Isley's termination, they could have sought Isley's reinstatement by submitting the matter to binding arbitration. In this context, Giantomaso would have known that any attempt to uphold Isley's termination by misrepresenting his statements at the third step hearing would have been promptly rebuffed by the union. That he nonetheless rested his decision on Isley's alleged falsehood demonstrates that he honestly believed—rightly or wrongly—that his actions were justified under the CBA, and he was willing to put it in writing. Consequently, the Shipyard's motion for summary judgment will be granted with respect to Isley's disparate treatment claims under the ADA.

*b. Failure to Accommodate*

As noted above, under the ADA, an employer may also be liable for discrimination if it does not make reasonable accommodations for the known disability of an otherwise qualified individual. Consistent with this duty:

> Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.

29 C.F.R. Pt. 1630, App. § 1630.9. Isley argues that Meixsell and Giantomaso failed in their obligation to engage with him in this interactive process. To succeed on his claim, he must show "1) the [Shipyard] knew about [his] disability; 2) [he] requested accommodations or assistance for his . . . disability; 3) the [Shipyard] did not make a good faith effort to assist [him] in seeking accommodations; and 4) [he] could have been reasonably accommodated but for the [Shipyard's] lack of good faith." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 330–31 (3d Cir. 2003).

"Employers cannot assume employees are disabled and need accommodations," and, therefore, employees carry the initial burden of providing notice and asking for help. *Taylor*, 184 F.3d at 313. "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id*. The adequacy of an employee's notice and request for accommodation is a fact-specific inquiry: "[w]hat information the employee's initial notice must include depends on what the employer knows." *Id*.

Isley argues that his references to his heart, coupled with his visit to the E.R. on February 19, gave sufficient notice to the Shipyard to trigger the interactive process. Under the

circumstances of this case, I disagree.  Before February 19, the Shipyard had no knowledge that Isley suffered from health problems that interfered with his work.  Nor had the Shipyard observed a decline in Isley's job performance that might have suggested that something was wrong.  Thus, absent a more thorough explanation from Isley, the Shipyard had no reason to assume that Isley's visit to the E.R. was for anything other than a one-time bought of chest pain—something that, by itself, would not constitute a "disability."  *Cf. id.* at 313–14 (employee adequately notified employer of mental disability where employer observed employee's psychotic behavior at work and knew of earlier psychiatric commitment).  Because Isley did not provide the Shipyard with adequate notice of his disability, his failure to accommodate claim must be rejected.

Independently, Isley's claim fails because he has not shown that he requested an accommodation for his disability.  Isley maintains that he first requested an accommodation when, during his February 27 meeting with Meixsell, shop steward Sean Harvey asked that Isley be allowed to use personal time to cover his last two no-pay absences.  But in Isley's telling, Harvey's request was based on Isley's accumulated balance of personal time and the Shipyard's need for manpower—not on Isley's health.  Isley also maintains that his request for FMLA leave during his third step hearing should be construed as a request for an accommodation under the ADA.  Although the Third Circuit recently held without elaboration that "a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA," *Capps*, 847 F.3d at 156–57, that was not the case here.  The FMLA provides leave for medical conditions that require hospitalization, but that would not automatically constitute disabilities within the meaning of the ADA.  For instance, an overnight stay in the hospital for an appendectomy might be covered under the FMLA, but not, generally speaking,

under the ADA. *See* 29 C.F.R. § 825.702 ("ADA's 'disability' and FMLA's 'serious health condition' are different concepts, and must be analyzed separately."). As a matter of common sense then, before a request for FMLA leave could reasonably be construed as a request for ADA accommodation, the employer would need to know (or have reason to believe) that the request for FMLA leave was based on something other than a one-time hospitalization, something that would fall outside the ADA's scope. As already noted, the Shipyard had no real notice of Isley's medical condition before February 2015, and therefore had no reason to interpret Isley's request for FMLA leave as a request for accommodation of the type of recurrent health issue that would rise to the level of a disability. Furthermore, Isley's requests for FMLA leave focused solely on his absences on February 19 and 23. While a prospective request for periodic FMLA leave might have put the Shipyard on notice that Isley was seeking a disability accommodation for an ongoing ailment, Isley's attempt to excuse retroactively two roughly contemporaneous prior absences would not.

In sum, the ADA contemplates a partnership between employees and employers. Because Isley did not hold up his end of the bargain by notifying the Shipyard of his disability and requesting an accommodation, his claim based on the Shipyard's failure to engage in the interactive process must be rejected. The Shipyard's motion for summary judgment will therefore be granted with respect to Isley's "failure to accommodate" claim.

### 2. Retaliation

Apart from his ADA discrimination claim, Isley alleges that the Shipyard retaliated against him for requesting that his absences be excused. Like his discrimination claim, Isley's retaliation claim is properly analyzed under *McDonnel Douglas*'s burden-shifting framework. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997). "To establish a prima

facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* at 500 (citations omitted).  Assuming for the sake of argument that Isley has established a prima facie case, his retaliation claim founders because he cannot rebut the Shipyard's claim that it legitimately fired him for violating its attendance policy and then upheld his termination because he lied at his third step hearing.  As discussed at length above, the record clearly demonstrates that Meixsell initiated Isley's termination *before* she learned of any health condition—a sequence of events that undercuts any inference of retaliation. Moreover, Giantomaso's actions show that he upheld Isley's termination because he honestly believed that Isley lied during his third step hearing, not because he wished to punish Isley for requesting an accommodation.  Because the record does not contain evidence that would "convince the factfinder . . . that retaliation was the real reason for the adverse employment action," *id.* at 501, Isley's ADA retaliation claim fails.[12]

### B. Isley's FMLA Claims

Congress passed the FMLA to "balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1).  The statute "requires certain employers to provide their employees with up to twelve weeks of leave in the event that the employee has a serious medical condition.  An employer faces liability under the Act and its implementing regulations if it interferes with a

---

[12] The Shipyard's argument that Isley's retaliation claim fails because "mere temporal proximity . . . is wholly insufficient to establish pretext," misstates the law.  To the contrary, the Third Circuit has held that "[w]hen temporal proximity . . . is unduly suggestive, this is *sufficient standing alone* to . . . defeat summary judgment." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (citations omitted) (emphasis added). Here, the close temporal proximity between Giantomaso learning of Isley's "heart condition" and deciding to uphold his termination was not "unduly suggestive" of discriminatory intent because the timing of his decision was dictated by the CBA.

right that the Act guarantees, or if it retaliates against an employee for invoking the Act's protections." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 251 (3d Cir. 2014) (citations omitted). Isley claims that by firing him for requesting FMLA leave, the Shipyard both interfered with his right to unpaid leave and retaliated against him. Neither claim succeeds.

### 1. Interference

"In order to assert an FMLA interference claim, an employee only needs to show [(1)] that he was entitled to benefits under the FMLA and [(2)] that he was denied them." *Id.* at 252 (quoting *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005)). To establish the first element, Isley must show that he missed work on February 19 and 23 because of a "serious condition," that is, "an illness, injury, impairment, or physical condition" involving either "(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Ultimately, Isley's condition does not qualify under either definition of "serious condition."

"Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility." 29 C.F.R. § 825.114. While the regulations do not define "overnight stay," the Third Circuit has held that the term means a visit lasting "for a substantial period of time from one calendar day to the next calendar day as measured by the individual's time of admission"—not his or her arrival time—"and time of discharge." *Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 206–07 (3d Cir. 2015). And while the Court of Appeals has reserved the question of what constitutes a "substantial period of time," it has suggested "a minimum of eight hours would seem to be . . . appropriate." *Id.* at 210. Under *Bonkowski*, Isley's visit to the E.R., from roughly 9:00 p.m. on February 19 until 12:30 a.m. on February 20, was not "inpatient care." Isley appears to concede this point, acknowledging that he never left the E.R. and was not actually

admitted to the hospital. Resp. Ex. R at 125:21–25. Because the clock never began running for purposes of calculating "a substantial period of time," Isley cannot show that he received inpatient care within the meaning of the FMLA.

Under the FMLA, the term "continuing treatment" encompasses, in relevant part, conditions resulting in "incapacity and treatment," 29 C.F.R. § 825.115(a), and "chronic conditions," § 825.115(c). For an absence to qualify under the former provision, the claimant must suffer "a period of incapacity of more than three consecutive, full calendar days" and must also receive, when deemed "necessary" by a healthcare provider, "(1) [t]reatment two or more times within 30 days of the first day of incapacity" or "(2) [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." Absences are attributable to a "chronic condition" when they arise from a health problem that, among other things, "(1) [r]equires periodic visits (defined as at least twice a year) for treatment by a health care provider . . . ; [and] (2) [c]ontinues over an extended period of time (including recurring episodes of a single underlying condition)."

Isley's February 19 visit to the E.R. does not fall into either category of "continuing treatment." Beginning with "incapacity and treatment," while Isley has a triable claim that he was incapacitated for more than three days,[13] he has not shown that he received the requisite

---

[13] The Shipyard contends that Isley was not incapacitated for three full consecutive days—an argument that is plainly contrary to the evidence in this case. Isley produced a doctor's note dated February 20, which directed him to refrain from working until February 23—a period of three days (the 20th, 21st, and 22nd). Viewing the facts in the light most favorable to Isley, this note, standing alone, can be read as evidence that he was incapacitated for the requisite period. Moreover, Isley testified that he suffered from acute discomfort, beginning on the afternoon of February 19, and continuing through February 23. Under Third Circuit law, Isley's lay testimony can be taken in combination with his doctor's note when calculating his period of incapacity. *See Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156 (3d Cir. 2010) (finding employee had demonstrated three days of incapacity by producing a doctor's note excusing her from two days of work and testifying that she was incapacitated for an additional two days).

follow-on treatment. Specifically, there is no evidence that Isley sought additional medical care within 30 days of February 23, when his period of incapacity ended. Nor was he specifically instructed by his doctors to do so, as required by § 825.111(a)(4). Rather, Isley's "discharge instructions" merely tell him to "follow up with medical MD" without providing a timeframe. Resp. Ex. Y at *6.[14] Similarly, there is no evidence that Isley was placed on a supervised regimen of continuing treatment—he was simply instructed take Motrin with meals and rest until his pain subsided. *Id*.

The regulatory provisions governing "chronic conditions" are no more accommodating of Isley's February 19 trip to the E.R. Isley sought treatment for costochondritis once in 2014 and once in 2015. Thus, at the time of his absences in February 2015, his condition had not "required periodic visits (defined as at least twice a year)" and therefore was not "chronic" within the meaning of § 825.111(c)(1).[15]

Because Isley's absences on February 19 and 23 were not attributable to a serious condition, he had no right to FMLA leave on those days and therefore cannot bring a claim for interference with his FMLA rights. This is so even if, as Isley claims, the Shipyard was obligated, and failed, to investigate whether his absences might have been covered under the FMLA.[16] To establish liability under this theory, Isley must demonstrate not only that the

---

[14] By way of comparison, Isley's "Discharge Summary" following a visit to the E.R. in May 2016 instructed him to see his primary care physician and a named cardiologist within one week. Resp. Ex. AA at *2.

[15] Isley also visited the E.R. twice in 2016, more than a year after he was terminated. On both occasions he was diagnosed with costochondritis and on his second visit he was also found to have an enlarged heart. However, because the operative timeframe for determining whether a condition qualifies as a serious condition is the time that leave is taken, *Navarro v. Pfizer Corp.*, 261 F.3d 90, 96 (1st Cir. 2001), Isley's 2016 visits to the E.R. do not bear on his claim here.

[16] Like the ADA, the FMLA's implementing regulations place an initial burden on the employee to provide their employer with notice of the need for FMLA leave. 29 C.F.R. §§ 825.302, 825.303. Where the employee provides information that allows the employer to "reasonably determine whether the FMLA may apply," § 825.303(b), the burden shifts and the employer "should inquire further of the employee . . . to ascertain whether leave is potentially

Shipyard failed to make the requisite inquiries into the reason for his absences, but also that he was prejudiced as a result of that failure. *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 157 (3d Cir. 2015). In this context, "[p]rejudice occurs when the employer's failure . . . rendered [the plaintiff] unable to exercise [his FMLA] rights in a meaningful way." *Id.*

Isley does not establish the requisite element of prejudice because he does not explain how his FMLA claim would have benefitted from additional action by the Shipyard. Nor could he, because any investigation by the shipyard into Isley's claim would have uncovered that his February 19 and 23 absences were not caused by a "serious condition" within the meaning of the statute. In short, because Isley was not entitled to FMLA leave, his interference claim must fail.

## 2. Retaliation

"FMLA retaliation claims are rooted in the FMLA regulations. They prohibit an employer from 'discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.'" *Budhun*, 765 F.3d at 256 (citing 29 C.F.R. § 825.220(c), among other things). To prevail, Isley must show that "(1) [he] invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights." *Lichtenstein*, 691 F.3d at 301–02 (citations omitted).

According to the Shipyard, Isley's failure to establish a serious condition dooms his retaliation claim just as it doomed his interference claim. Whether entitlement to FMLA leave is

FMLA–qualifying," § 825.301. Furthermore, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA–qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." § 825.300(b)(1). I assume for the sake of argument that Isley provided the Shipyard with sufficient notice of his request for FMLA leave to trigger its duty to "inquire further."

actually an element of a retaliation claim appears to be an open question of law.[17]  I need not

decide it here, however, because Isley's FMLA retaliation claim fails for the same reason as his

ADA retaliation claim.  As discussed at length above, the record simply does not support a

finding that the Shipyard terminated Isley or then upheld his termination because he invoked his

statutory right to leave.

## IV.    CONCLUSION

For the foregoing reasons, the Shipyard's motion for summary judgment will be granted.


        /s/ Gerald Austin McHugh
United States District Judge

---

[17] The only court to have squarely addressed this issue is the Northern District of Iowa.  In *Johnson v. Dollar General*, Judge Mark Bennett issued a thorough and well-reasoned opinion holding that an FMLA "'retaliation' claim does not require proof that the plaintiff actually suffered a 'serious health condition,' only that the plaintiff gave adequate and timely notice to the employer that he or she needed leave for a condition that the plaintiff believed, in good faith, might be covered by the FMLA."  880 F. Supp. 2d 967, 994 (N.D. Iowa 2012).